1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                          DISTRICT OF NEVADA

8                                  * * *

BILLY CEPERO,
9                                           Case No. 3:12-cv-00263-MMD-VPC
                          Plaintiff
10        v.                                            ORDER

11   HIGH DESERT STATE PRISON, *et al.,*

12                        Defendants.

13

14   **I.    SUMMARY**

15        Before the Court is Defendants' Motion for Summary Judgment ("Motion"). (Dkt.

16   no. 143.) Plaintiff filed an opposition ("Opposition") (dkt. no. 170), and Defendants filed a

17   reply (dkt. no. 177). For the reasons stated below, the Motion is granted in part and

18   denied in part.

19   **II.   BACKGROUND**

20        Billy Cepero ("Plaintiff") is an inmate in the custody of the Nevada Department of

21   Corrections ("NDOC") at Southern Desert Correctional Center. The relevant events

22   occurred while Plaintiff was incarcerated at High Desert State Prison ("HDSP") in Indian

23   Springs, Nevada.

24        The Court derives the following background facts and allegations from the Second

25   Amended Complaint ("SAC"), and supplements as necessary from the parties' briefs. In

26   May 2010, Plaintiff began serving a lengthy sentence at HDSP for several sex offenses.

27   Shortly following his arrival, Defendants evaluated his medical care needs. Plaintiff has

28   preexisting   problems   with   his   right   shoulder,   and   he   alleges   that,   prior   to   his

incarceration, medical providers recommended a course of physical therapy to decrease his pain and increase his range of motion. Upon their own medical intake evaluation, however, Defendants did not prescribe a physical therapy regimen. Thus, Plaintiff did not receive physical therapy treatments during his time at HDSP.

After his initial housing classification hearing in June 2010, Defendants assigned Plaintiff, who has no gang affiliation, a cellmate who is a member of a known security threat group ("STG"), the Sureños gang. In July 2010, Plaintiff received death threats and he and his cellmate had a physical altercation. When removing the two inmates from the cell, Defendants collected and held the inmates' personal belongings. Sometime thereafter, they allegedly lost Plaintiff's "miscellaneous items" and, specifically, several legal documents that contained his and his family members' personally identifying information.

As a result of the fight, Plaintiff received a short disciplinary segregation sentence. On September 21, 2010, Plaintiff was permitted to leave disciplinary segregation and return to general population housing. However, Plaintiff was housed with members of the Sureños gang, and two of the gang members stabbed Plaintiff with a weapon of sorts in the chow hall later that day. Prison officials immediately took Plaintiff to the University Medical Center ("UMC") in Las Vegas, where he received care for the wounds. Unrelated thereto, UMC clinicians also provided plaintiff with a Jewett back brace[1] for back problems that they discovered while treating his other injuries. Upon discharge from UMC, providers instructed Plaintiff to wear the brace for the next six weeks at any time he was out of bed. Upon his return to HDSP, officials placed Plaintiff in the infirmary, a secure area, and allowed him to keep the brace. However, upon his transfer to administrative segregation, where he was to be held for his safety due to the recent

---

[1]A Jewett brace "helps control and support [a patient's] spinal posture, helps reduce pain, prevents further injury and promotes healing. . . . It is often prescribed for the treatment of compression fractures . . . ." *Using Your Jewett Spinal Orthosis (Brace) at Home*, UWHealth.org, www.uwhealth.org/healthfacts/neuro/5394.pdf (last visited Mar. 6, 2015).

violence, officials removed the brace from his possession because it contained a substantial amount of metal. Two weeks later, they gave him a different brace.

Plaintiff remained in administrative segregation for twenty months, aside from one day in which he was held in protective custody. His transfer to protective custody status was quickly rescinded. During this time period, he awaited the availability of housing at Lovelock Correctional Center ("LCC"), to which he was transferred in late April 2012.

Based upon these allegations, and acting *pro se*, plaintiff asserts six civil rights claims under 42 U.S.C. § 1983 against numerous prison officials. (Dkt. no. 27 at 2-8.) First, Plaintiff alleges two counts under the Eighth Amendment for failure to protect: one for his initial housing placement, and the other for the chow hall stabbing. Second, he alleges two additional counts under the Eighth Amendment for inadequate medical care: one for the lack of physical therapy treatment, and the other for confiscation of the back brace. Finally, he brings two counts under the Fourteenth Amendment: one for lack of procedural due process in his administrative segregation placement, and the other for the loss of his legal papers and other items. (*Id.* at 9-14.)

## III.   LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Nw. Motorcycle Ass'n*, 18 F.3d at 1472. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties'

1   differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th

2   Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89

3   (1968)). In evaluating a summary judgment motion, a court views all facts and draws all

4   inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v.*

5   *Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).  Courts must also liberally

6   construe documents filed by *pro se* litigants. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

7   (per curiam).

8         The moving party bears the burden of showing that there are no genuine issues

9   of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). "In

10  order to carry its burden of production, the moving party must either produce evidence

11  negating an essential element of the nonmoving party's claim or defense or show that

12  the nonmoving party does not have enough evidence of an essential element to carry its

13  ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

14  F.3d 1099, 1102 (9th Cir. 2000). Once the moving party satisfies Rule 56's requirements,

15  the burden shifts to the party resisting the motion to "set forth specific facts showing that

16  there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may

17  not rely on denials in the pleadings but must produce specific evidence, through

18  affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME*

19  *Hosps.*, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show

20  that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT &*

21  *SA*, 285 F.3d 764, 783 (9th Cir. 2002) (citation and internal quotation marks omitted).

22  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be

23  insufficient." *Anderson*, 477 U.S. at 252.

24  **IV.   DISCUSSION**

25        Plaintiff asserts claims under 42 U.S.C. § 1983.  Section 1983 aims "to deter state

26  actors from using the badge of their authority to deprive individuals of their federally

27  guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (quoting

28  *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000)). The statute "provides a federal

1    cause of action against any person who, acting under color of state law, deprives

2    another of his federal rights[,]" *Conn v. Gabbert*, 526 U.S. 286, 290 (1999), and is

3    "merely . . . the procedural device for enforcing substantive provisions of the Constitution

4    and federal statutes," *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Claims

5    under § 1983 require the plaintiff to allege (1) the violation of a federally-protected right

6    by (2) a person or official who acts under the color of state law. *Warner*, 451 F.3d at

7    1067. To prevail, the plaintiff must allege and prove sufficient facts under each element

8    of the underlying constitutional or statutory right.

9        In this case, Defendants are each state prison officials acting within their

10   respective capacities under state law. Plaintiff alleges violations of his constitutional

11   rights. Therefore, he has satisfied § 1983's threshold requirements and the Court will

12   proceed to analyze each of his claims.

13       **A.    Failure to Protect Claims**

14           **1.    Standard**

15       The Eighth Amendment "'embodies broad and idealistic concepts of dignity,

16   civilized standards, humanity, and decency . . .'" by prohibiting imposition of cruel and

17   unusual punishment by state actors. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting

18   *Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968)). The Constitution's stricture on the

19   "unnecessary and wanton infliction of pain" encompasses deliberate indifference to the

20   safety of inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Indeed, "having

21   stripped [inmates] of virtually every means of self-protection and foreclosed their access

22   to outside aid, the government and its officials are not free to let the state of nature take

23   its course." *Id.* Prison officials must "'take reasonable measures to guarantee the safety

24   of the inmates' and to 'protect prisoners from violence at the hands of other prisoners.'"

25   *United States v. Stoterau*, 524 F.3d 988, 1013 (9th Cir. 2008) (quoting *Farmer*, 511 U.S.

26   at 832-33).

27       Claims for failure to protect have two elements. *Hearns v. Terhune*, 413 F.3d

28   1036, 1040 (9th Cir. 2005); *see also Lemire v. Cal. Dep't of Corrs. and Rehab.*, 726 F.3d

1062, 1074-78 (9th Cir. 2013). First, the prisoner must establish that officials exposed him to an objectively substantial risk of serious harm. *Lemire*, 726 F.3d at 1075-76. Second, he must prove that the officials were deliberately indifferent — that is, that they disregarded their subjective awareness of the risk without reasonable justification. *Id.* at 1077-78. Accordingly, it is not enough that prison officials are aware of facts from which they *could* infer the presence of an excessive risk; instead, they must "draw the inference." *Farmer*, 511 U.S. at 837. The culpable state of mind is "something more than mere negligence . . ." but "something less" than purpose or intent. *Hearns*, 413 F.3d at 1040.

### 2.    Analysis of Counts I and II

Because these claims turn on related factual contentions and identical legal standards, the Court examines them together. Although Defendant's Motion focuses mainly on the subjective element of the inquiry, *see Lemire*, 726 F.3d at 1075-76, the Court first considers whether Plaintiff faced an objectively substantial risk of harm before turning to Defendants' subjective states of mind.

### a.    Substantial Risk of Harm

In Count I, Plaintiff contends that Defendants Neven, Baca, Howell, Wickham, Morrow, Gerke, Garcia, and Vasquez "directed or approved [his] initial housing classification at HDSP[,]" which led to his placement in general population with a gang-member cellmate, notwithstanding his "physical condition, . . . criminal charges, [and] . . . non-affiliation to any gang or group." (Dkt. no. 27 at 9.) He brings Count II against the same defendants, except that he includes Daniels and excludes Vasquez. (*Id.* at 10.) The SAC is somewhat ambiguous as to his Count II theory, but the Court construes from it and his Opposition that Plaintiff alleges that identical factors placed him at risk of attack

///

///

///

///

1    in the same general population housing unit, to which he returned following his release

2    from disciplinary segregation in September 2010.[2] (*See id.*; *see also* dkt. no. 170 at 7-9.)

3        Plaintiff's Opposition provides further insight to the nature of the purported risks

4    that he faced. He states that his "physical condition" is limited use of his right arm and

5    that the "criminal charges" are sex offenses. (Dkt. no. 170 at 5.) Because he "stand[s]

6    alone" among the inmates due to his lack of gang affiliation (*Id.*), these factors rendered

7    him vulnerable to violence by fellow prisoners at HDSP: Plaintiff asserts that HDSP

8    inmates obtain presentence reports and other information about new inmates' criminal

9    offenses, and those who do not "check out" are targeted for physical abuse. (*Id.* at 4.)

10   The connection is not express, but the plain allusion is that Plaintiff's status as a sex

11   offender presented a serious risk of harm. The risk, Plaintiff argues, was heightened with

12   members of the Sureños gang. They have a disruptive and violent "modus operandi" and

13   a "Code" under which, Plaintiff intimates, they purposively attack sex offenders. (*See id.*

14   at 4.)

15       The Court concludes that neither Plaintiff's physical limitation nor his non-

16   affiliation with a gang constituted objectively excessive risks of harm. The record before

17   the Court is devoid of any evidence from which a jury might determine that these factors

18   constituted anything more than de minimis risks beyond inherent risks found in a prison

19   environment. First, beyond Plaintiff's sweeping contentions, nothing in the record would

20   permit a reasonable jury to conclude that plaintiff's physical condition subjected him to

21   an excessive risk of harm by the mere fact of housing among other inmates, whether or

22   not some of these inmates are gang members. Second, Defendants have offered

23   undisputed evidence that Plaintiff's lack of gang membership worked to enhance his

24   safety, rather than detract from it. HDSP Associate Warden Tim Filson attests that

25   "[t]here is no known risk to a prisoner . . . to be housed in a unit in which there are known

26

27       [2]In other words, Plaintiff does not contend that the July altercation with his
     cellmate placed him at risk for violence by other Sureños members. Instead, as the
28   Court explains above, Plaintiff believes that his sex offender status was the causal
     factor.

gang members so long as the prisoner is not a member of a competing or enemy gang, and has no conflict with the gang or any of its members." (*Id.* at ¶ 8.) Plaintiff's contrary assertion is entirely uncorroborated and speculative and is, therefore, insufficient to demonstrate a genuine factual dispute.

As to his sex offender status, the Court will assume, without deciding, that it presented an objectively serious risk of harm. Defendants do not contest Plaintiff's specific position that sex offenders face heightened violence at NDOC institutions. Instead, they seemingly suggest that an inmate's criminal history never constitutes a substantial risk of harm; after all, every inmate at an NDOC institution is a convicted felon. (Dkt. no. 143 at 12.) However, the Court can easily envision scenarios where certain criminal histories would subject an inmate to considerable risks of violence — whether from particular inmates, or from the prison population more generally. The notion that sex offenders face greater risks of violence within Nevada prisons is neither new nor farfetched. *See, e.g.*, *Romero v. Nev. Dep't of Corrs.*, No. 2:08-cv-00808-JAD-VCF, 2013 WL 6206705, at *14 (D. Nev. Nov. 27, 2013) (quoting the plaintiff's argument that "'it is common knowledge within the prison environment that any inmates known to have been convicted of sexual offenses will be assaulted and will be killed by gang members'"). Accordingly, for the purpose of analysis, the Court accepts that the risk to Plaintiff based upon his history of sex offenses was objectively substantial.

### b.   Deliberate Indifference

In their Motion, Defendants argue that undisputed evidence establishes that they did not subjectively disregard a substantial risk to Plaintiff. (Dkt. nos. 143 at 12-13, 177 at 5-8.) In contrast, Plaintiff argues that they had knowledge of the risk posed by Sureños members. In support of their Motion, Defendants produce an affidavit and Plaintiff's case notes log, the latter of which documents events and information pertaining to his incarceration, such as classification hearings and housing placements. Although the log suggests that Defendants knew of Plaintiff's sex offender status at the time of his initial classification hearing (*see* dkt. no. 143-4 at 2) (describing, in an entry

titled "Class / Initial," that Plaintiff is a "36 year old 2nd termer serving" several sentences for "statutory sexual seduction"), both the log and affidavit evidence that Plaintiff repeatedly affirmed that he was not a member of a gang and "had no issues with STG groups" such as the Sureños. (Dkt. nos. 143-1 at ¶ 4, 143-4 at 2.) Plaintiff so stated during his initial classification hearing on June 24, 2010, and also on September 21, 2010, prior to his return to general population. (Dkt. no. 143-1 at ¶¶ 7-9). The log further shows that Plaintiff represented that he had "no problems" with his former cellmate, and also that he did not know why he was stabbed in September 2010. Plaintiff does not dispute that he made these statements. Accordingly, Defendants argue that, due to their reliance on this information from Plaintiff, they lacked specific knowledge of any particular risks to Plaintiff posed by his cellmate or other Sureños members at the time of his initial placement and return to general population. (Dkt. no. 143 at 12, 14.)

Plaintiff attempts, but fails, to demonstrate a genuine factual dispute as to Defendants' subjective awareness of the risk. Plaintiff's Opposition does not contest the evidence that Defendants offer to show regarding his repeated denial of problems with the Sureños or other groups. Instead, he asserts that Defendants were aware, at the time of his initial classification and thereafter, that he had been involved in a confrontation with a Sureños member at the Clark County Detention Center ("CCDC"), where law enforcement authorities held Plaintiff during the underlying criminal proceedings. Purportedly, Defendants knew of this incident on the basis of records provided to NDOC officials by CCDC upon his transfer to HDSP. (Dkt. no. 170 at 3.) Plaintiff adduces a letter from CCDC officials, which states that they release "medical and disciplinary records" to the NDOC upon a change of custody. (*Id.* at 33.) The letter fails to create a genuine factual issue for several reasons. First, it provides not even a scintilla of evidentiary support for Plaintiff's claim of troubles with another CCDC detainee. Second, and relatedly, it fails to evidence that any records delivered to the NDOC described an altercation with a Sureños member on the basis of Plaintiff's sex
///

1    offender charges. Third, it provides no indication that the particular Defendants reviewed

2    the alleged records.

3        Moreover, Defendants' evidence forecloses a reasonable jury from accepting

4    Plaintiff's version of the facts. If Plaintiff did indeed experience troubles with a Sureños

5    member at CCDC on the basis of his sex offenses, it is puzzling that he declined to

6    share such information during his initial classification hearing, or following the violent

7    incident with his cellmate. By late September 2010, Plaintiff had been involved in two (or

8    allegedly three) incidents with Sureños members; surely, if his sex offender status was

9    the genesis of these incidents,[3] one would reasonably expect Plaintiff to say so when

10   Defendants asked. Although he isolates one statement in the reports about the

11   September 21 stabbing — that it was a "well-orchestrated hit" (dkt. nos. 170 at 9, 42) —

12   Plaintiff does not dispute that Defendants relied upon his own words to conclude that he

13   was not at risk of violence. Although Defendants could have been aware of a risk that

14   was unknown to Plaintiff, his burden at this stage is to identify specific factual bases from

15   which a jury might conclude that Defendants not only had such knowledge, but also that

16   they disregarded it. Plaintiff, however, does not state that he informed Defendants that

17   his sex offender status had made him a target of the Sureños, and he does not provide

18   evidentiary support to establish other bases from which Defendants would have known

19   of the risk his sex offender status allegedly posed.

20       In sum, there are no triable issues of fact as to the subjective element of Plaintiff's

21   failure to protect claims. NDOC officials are not relieved of their obligations to

22

23       [3]If anything, the reports on the matter, which Plaintiff produces with his
     Opposition, each suggest that the stabbing resulted from the conflict between Plaintiff
24   and his former cellmate. (Dkt. no. 170 at 44-45.) If the Court considers that the objective
     risk for the September assault was Plaintiff's prior alteration with a gang member, rather
25   than his attenuated sex offender theory, the evidence once again forecloses the
     possibility that Defendants had subjective awareness. At the classification hearing that
26   preceded Plaintiff's return to general population, he stated, as he had on prior occasions,
     that he had "no problems" with his former cellmate or any other individuals at HDSP.
27   (Dkt. nos. 143-1 at ¶ 9, 143-4 at 2.) His statement thereby quashed any basis
     Defendants may have had for inferring that Sureños might seek retribution against him at
28   the time.

1   independently evaluate the known risks to inmates simply because of inmates'

2   statements. But in this case, Defendants have offered evidence, which Plaintiff has not

3   disputed, that they did evaluate those risks, and in doing so relied upon Plaintiff's

4   representations as to lack of risks. Because no other evidence in the record provides

5   sufficient support for concluding that Defendants disregarded subjective awareness of

6   the risks posed to Plaintiff by his cellmate or other Sureños gang members on the basis

7   of his sex offender status, Defendants are entitled to summary judgment on the failure to

8   protect claims.

9          **B.    Medical Care Claims**

10                 **1.    Standard**

11         The Eighth Amendment compels the state "to provide medical care for those

12   whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. As with other Eighth

13   Amendment claims, medical care claims proceed under a two-part test. The plaintiff

14   must satisfy "an objective standard — that the deprivation was serious enough to

15   constitute cruel and unusual punishment — and [also] a subjective standard —

16   deliberate indifference." *Colwell*, 763 F.3d at 1066 (quoting *Snow v. McDaniel*, 681 F.3d

17   978, 985 (9th Cir. 2012)) (internal citations and quotation marks omitted). The objective

18   component examines whether the plaintiff has a "serious medical need," such that the

19   state's failure to provide treatment could result in further injury or cause unnecessary

20   and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1090, 1096 (9th Cir. 2006).

21   Serious medical needs are those "that a reasonable doctor or patient would find

22   important and worthy of comment or treatment; the presence of a medical condition that

23   significantly affects an individual's daily activities' or the existence of chronic and

24   substantial pain." *Colwell*, 763 F.3d at 1066 (citation and internal punctuation omitted).

25         The subjective element considers the defendant's state of mind, the extent of care

26   provided, and whether the plaintiff was harmed. First, only where a prison "official 'knows

27   of and disregards an excessive risk to inmate health and safety'" is the subjective

28   element satisfied. *Id.* (quoting *Toguchi v. Chung*, 391 F.3d 1050, 1057 (9th Cir. 2004)).

1   Not only must the defendant prison official have actual knowledge from which he or she
2   can infer that a substantial risk of harm exists, but he or she "must also draw that
3   inference." *Id.* at 837. The standard lies "somewhere between the poles of negligence at
4   one end and purpose or knowledge at the other[,]" *id.* at 836, and does not include
5   "accidental or unintentional failures to provide adequate medical care . . . ," *Estelle*, 429
6   U.S. at 105.

7        Second, the defendants' conduct must consist of "more than ordinary lack of due
8   care." *Farmer*, 511 U.S. at 835. The medical care due to prisoners is not limitless, as
9   "society does not expect that prisoners will have unqualified access to health care."
10  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Prison officials are not, therefore, deliberately
11  indifferent simply because they selected or prescribed a course of treatment or care
12  different than the one the inmate requests or prefers. *McGuckin v. Smith*, 974 F.2d 1050,
13  1060 (9th Cir. 1992), *overruled on other grounds by WMX Techs. v. Miller*, 104 F.2d
14  1133, 1136 (9th Cir. 2007). Only where the prison's chosen course of treatment is
15  "medically unacceptable under the circumstances" are the officials' medical choices
16  constitutionally infirm. *Colwell*, 763 F.3d at 1068 (quoting *Snow*, 681 F.3d at 988)
17  (internal quotation marks omitted). Finally, the plaintiff must prove that he was harmed,
18  although the harm need not be substantial. *Jett*, 439 F.3d at 1096.

19                    **2.    Analysis of Count III**

20       In the first of two inadequate medical care claims, Plaintiff avers that Defendants
21  Aranas, Graham, Neven, Baca, Howell, Wickham, and Morrow were deliberately
22  indifferent to the medical needs of his right shoulder by refusing to treat him with
23  recommended physical therapy. (Dkt. no. 27 at 12.)   Defendants argue that Plaintiff
24  has failed to allege specific involvement by any of them, and that Defendant Aranas, an
25  HDSP physician, did not find during his intake medical evaluation that Plaintiff's medical
26  needs required physical therapy for his shoulder. (Dkt. no. 143 at 15.) Plaintiff does not
27  respond to Defendant's contention about the initial intake evaluation, but he does offer
28  myriad allegations which, in short, maintain that Defendants have failed to care for his

1    arm over several years. (Dkt. no. 170 at 11-13.) Defendants dispute Plaintiff's contention

2    of maltreatment, and they further argue that their decision to discontinue a previous

3    course of treatment does not, in itself, violate the Constitution. (Dkt. no. 177 at 9-10.)

4        Accepting that Plaintiff's shoulder condition is an objectively serious medical

5    need, *Jett*, 439 F.3d at 1096, the undisputed evidence shows that Defendants were not

6    aware of a prior order for physical therapy and therefore could not have been

7    deliberately indifferent to Plaintiff's shoulder pain. At an intake medical evaluation on

8    June 2, 2010, Plaintiff reported to Defendant Aranas a history of nose bleeds, right

9    humerus (i.e. upper arm) fracture, and a prior gunshot wound to his right knee. (Dkt. no.

10   143-2 at ¶ 2.) Although Aranas identified a restricted range of motion in Plaintiff's right

11   arm, which Plaintiff could not lift above his shoulder or behind his head, Plaintiff did not

12   provide any other information to Aranas about prior medical treatment or

13   recommendations related to his arm or shoulder. (*See id.*) Plaintiff has not disputed

14   these facts. Hence, it is clear that, beyond knowledge of some movement limitations,

15   Defendants initially lacked awareness of medical problems with Plaintiff's shoulder, let

16   alone a purported prior order for physical therapy.

17       Moreover, the evidence submitted does not support Plaintiff's contention that

18   Defendants were deliberately indifferent in discontinuing his physical therapy regimen.

19   Plaintiff points to two documents to support his claim of discontinued treatment: (1) notes

20   following a post-operative evaluation with physical therapist Rosa Morgan at UMC (dkt.

21   no. 170-1 at 11); and (2) vague notes from his stay at CCDC which state "physical

22   therapy issue" and "pt issue," without specific reference to a particular underlying

23   condition (*Id.* at 13). It is apparent from these records that Morgan recommended not

24   treatment with a physical therapist, but rather that Plaintiff begin "*home* exercises." (*Id.* at

25   11) (emphasis added).  Accordingly, neither document supports Plaintiff's contention that

26   physical therapy treatments were discontinued or denied.

27       At the very most, this claim rests on Plaintiff's disagreement with the medically

28   acceptable course of treatment he received at HDSP. Plaintiff's shoulder problem

1    presented an issue of pain management, and Defendants consistently provided pain
2    medication and other care to Plaintiff related thereto. In July 2010, due to his complaints
3    of arm numbness, Plaintiff was scheduled to see Defendant Aranas. (Dkt. no. 178-2 at
4    2.) Aranas diagnosed him with "status post open reduction internal fixation of right
5    humerus." (*Id.*) Following the September altercation and recovery, Defendants examined
6    Plaintiff repeatedly, and their notes contain no indication that Plaintiff conveyed any
7    problems or concerns with his shoulder. (*Id.* at 2-3.) However, in March 2011, Defendant
8    Graham wrote the following notes after a medical visit: "Multiple medical issues that can't
9    be resolved at this time. . . . [Plaintiff] [c]omplained that he sustained an injury to R
10   shoulder in Oct 2009 and had subsequent open surgical repairs with 4 screws in
11   shoulder. . . . I feel he could benefit from a[n] orthopedic evaluation of shoulder to
12   determine function and limits." (*Id.* at 3.) Therefore, Graham ordered an orthopedic
13   consult. (*Id.*)

14       Although the NDOC's Utilization Review Panel ("URP") disapproved Graham's
15   recommendation (*id.* at 4; dkt. no. 178-1 at 13), Defendants assisted with pain
16   management of the shoulder by providing Plaintiff various pain medications, and also
17   recommended that he begin range of motion exercises. (Dkt. no. 178-1 at 53-54, 91, 93,
18   98, 99, 120; *see also* dkt. no. 178-2 at 5-6.) On September 26, 2012, Plaintiff received a
19   magnetic resonance imaging ("MRI") exam on his right shoulder, and Dr. Leon Jackson,
20   a radiologist, found that the shoulder lacked signs of fracture, dislocation, or
21   degenerative changes. (Dkt. no. 178-1 at 5.)  Plaintiff's continued complaints of pain led
22   Defendant Aranas and Dr. Sean Su to again request an external orthopedic consult on
23   March 28, 2014, which the URP approved three days later. (Dkt. no. 178-1 at 11.) On
24   September 12, 2014, Dr. Richard Wulff, a non-NDOC radiologist, performed an MRI of
25   Plaintiff's shoulder, and in light of the images, he recommended that Plaintiff be
26   prescribed a "consistent course of [pain medication.]" (*Id.* at 7.)

27       Plaintiff's medical records establish that his shoulder condition was one that
28   required pain management — which is precisely the care Defendants provided. The

medical imaging impressions, and Wulff's 2014 recommendation, in particular, establish that Plaintiff faced no deterioration to his shoulder condition, even as his pain endured. As the record fails to suggest that Defendants had subjective knowledge of a preexisting order for physical therapy (if, in fact, such an order existed), and also establishes beyond dispute that they provided consistent treatment for Plaintiff's shoulder pain, this deliberate indifference claim necessarily fails. Defendants are entitled to summary judgment on Count III.

### 3.      Analysis of Count IV

Plaintiff's second medical care claim alleges deliberate indifference by Defendants Graham, Aranas, Adams, Murphy, Melton, Shield, Fowler, Lindsay, Morrow, Wickham, Baca, and Neven for the confiscation of the Jewett brace. (Dkt. no. 27 at 13.) Defendants argue that the SAC lacks any particular allegations about how each Defendant was involved, beyond Plaintiff's broad and conclusory allegation that they "were accessories and/or directed the confiscation . . . ." (Dkt. no. 143 at 17.) Moreover, Defendants argue that the confiscation was medically acceptable given the concerns about safety and security and because they provided an alternative brace, Plaintiff will be unable to show that the care was medically unacceptable. (*See id.* at 18.) Plaintiff counters that the brace returned to him on October 22 was not the Jewett brace, but rather a brace designed to provide back support when lifting heavy objects — such as the kind a "hardware store" employee might wear.[4] (Dkt. no. 170 at 17; *see also id.* at 58.) He contends that he suffered pain from the lack of the brace and also further injury, including deterioration to his back condition. (*See id.* at 17.) In reply, Defendants submit Plaintiff's medical records in support of their argument that he suffers only from degenerative disc disease, and not a back fracture. (Dkt. no. 177 at 12.) They contend that Plaintiff will not be able to show medically unacceptable care because the Jewett

---

[4]Although he does not expressly articulate the argument, it is evident that he believes that Defendants' decision was medically unacceptable because the Jewett brace, unlike the brace they provided, is a medical device that treats and aids healing of compression fractures. (Dkt. no. 170 at 17; *see also id.* at 60.)

1   brace "is designed to heal compression fractures[,]" and Plaintiff "did not suffer a fracture

2   to his back[,]" and also because Graham provided a replacement brace "to assist him

3   with his degenerative disc issues." (*Id.* at 12-14.)

### a.   Serious Medical Need

5         As the Court has described, the first element of an inadequate medical care claim

6   requires an objectively "serious medical need." *Jett,* 439 F.3d at 1096; *Colwell*, 763 F.3d

7   at 1066. Defendants' argument that Plaintiff will be unable to establish such a need

8   because he did not have a back fracture is meritless. In fact, the record belies their

9   characterization of the UMC records. UMC physicians identified a compression fracture

10  in Plaintiff's lumbar spine. The fracture was an objectively serious medical need; it was

11  an injury that, left untreated, could cause further injuries or unnecessary pain. *Jett*, 439

12  F.3d at 1096.

13        Shortly after the violent incident in the chow hall, physicians at UMC provided

14  trauma care to Plaintiff for several stab wounds. They ordered and performed computed

15  tomography ("CT") and MRI exams on Plaintiff's spine. On September 22, 2010, UMC

16  physician Dr. Nathan Ozobia noted that a CT of Plaintiff's thoracic (i.e. upper and

17  middle) spine "showed no acute fracture[s,]" but a CT of the lumbar (i.e. lower) spine

18  "showed compression deformity of the L2 vertebral body, predominantly left side. It could

19  be old." (Dkt. 178-1 at 27.) Radiologist Dr. Yousuf Schultz's impression of an MRI of the

20  lumbar spine provided further insight into the meaning of "compression deformity" and

21  the nature of Plaintiff's injury. Specifically, he identified a "wedge deformity of the L2

22  vertebral body that appears subacute to chronic. . . . No *other fractures* are identified."

23  (*Id.* at 29) (emphasis added).

24        Dr. Schultz's use of "other fracture" is revealing. In the context of his findings, the

25  fracture can refer only to the "wedge deformity" in Plaintiff's lumbar spine. Dr. Ashok

26  Gupta similarly found a "compression of the L2 vertebral body predominantly on the left

27  side . . . ," but noted that the injury "is age indeterminate." (*Id.* at 31.) In light of these

28  findings, Dr. Ozobia wrote the following in his discharge notes on September 23:

1    "[Plaintiff's] clinical course was unremarkable, however, in the course of his trauma

2    workup he was found to have an incidental irregularity at lumbar vertebra 2, which was

3    further investigated *and found to be a chronic L2 compression fracture*." (*Id.* at 22)

4    (emphasis added). For that reason, "[Plaintiff] is discharged per the above . . . ," namely,

5    with instructions to wear the Jewett brace "while out of bed." (*Id.*) He instructed Plaintiff

6    to wear the brace for six weeks. (Dkt. no. 170-1 at 37.)

7       The record thus establishes precisely the opposite of what Defendants contend.

8    Plaintiff did, in fact, have a compression fracture in his lumbar spine upon his return to

9    HDSP, with a physician's order to wear a back brace designed to treat, as Defendants

10   concede, the very injury from which Plaintiff suffered. (*See* dkt. no. 177 at 13.) If any

11   doubt remains as to the presence of the injury, even Defendant Aranas recognized that

12   the UMC records reflected the presence of a compression fracture. As he wrote in

13   Plaintiff's medical progress notes on September 23, Plaintiff "was also wearing [a Jewett]

14   brace. [He was] [r]evealed to have an order compression fracture [at] L2." (Dkt. nos. 178-

15   1 at 89, 178-2 at 2.) Viewing these evidence in the light most favorable to Plaintiff, the

16   injury was a serious medical need sufficient to establish the first element of an Eighth

17   Amendment claim.

18                      **b.**      **Deliberate Indifference**

19       The inquiry next turns to whether Defendants were deliberately indifferent and

20   whether Plaintiff was harmed. *Colwell*, 763 F.3d at 1066; *Jett*, 439 F.3d at 1096.

21   Embodied within the inquiry is whether the treatment choices made by Defendants were

22   medically acceptable. *See Colwell*, 763 F.3d at 1068.

23       As a preliminary matter, the Court agrees with Defendants that Plaintiff fails to

24   allege involvement by most of the Defendants. However, he does specifically identify

25   Defendant Graham in his opposition, and he supports his identification with a grievance

26   in which prison officials stated that Graham decided to confiscate the brace. (Dkt. no.

27   170 at 16.) Further, Plaintiff produces a grievance about the Jewett brace signed by

28   Defendant Neven, who, as Warden, affirmed that the brace "will not be returned. . . ." (*Id.*

1    at 55.)  Accordingly, the record provides a reasonable basis for inferring knowledge and

2    involvement by these two Defendants. *See Michaud v. Banister*, No. 2:08-cv-01371-

3    MMD-PAL, 2012 WL 6720602, at *9-10 (D. Nev. Dec. 26, 2012) (holding, under *Starr v.*

4    *Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011), that denial of a prison grievance is sufficient

5    involvement for supervisory liability on a § 1983 claim). The essence of their remaining

6    argument is that the back brace issue represents nothing more than Plaintiff's

7    disagreement with a medically acceptable decision to provide an alternative brace. (Dkt.

8    no. 143 at 18) (citing *Franklin*, 662 F.3d at 1344). To the extent Plaintiff required care,

9    they argue that he needed only treatment for degenerative disc disease. (*See* Dkt. no.

10    177 at 12-13.)

11       Defendant's argument is unpersuasive. Although Defendants are correct that

12    Plaintiff suffers from degenerative disc disease (*see, e.g.*, dkt. no. 178-1 at 29)

13    (mentioning "trace degenerative disk [sic] disease"), the Court's foregoing discussion of

14    the UMC records makes plain Plaintiff had a compression fracture in his lumbar spine in

15    September and October 2010. Thus, that the brace that Graham provided and Neven

16    approved may have been a medically acceptable method of treating disc disease is

17    wholly irrelevant. The issue is whether, by taking the Jewett brace, they were

18    deliberately indifferent to his compression fracture.

19       The medical acceptability of treating a compression fracture with the alternative

20    brace is a question of fact. *Michaud*, 2012 WL 6720602, at *12. In *Michaud*, this Court

21    denied summary judgment on the basis that it is within the jury's province to determine

22    whether a course of treatment is medically acceptable. The Court considered repeated

23    decisions by the NDOC's URP to overturn physician recommendations for surgical

24    correction of an inmate's eye cataract. *Id.* at *1. Because of the URP's repeated denials

25    of the uncontroverted recommendations, the inmate received only headache medication

26    and an eye patch. *Id.* The Court distinguished the case from occasions in which a prison

27    physician and the inmate disagree about the selected course of care. *Id.* at *8. As the

28    Court explained, "each physician who individually reviewed Michaud's vision concluded

1    that surgery was necessary, and . . . the only difference of opinion existed between

2    these physicians and the URP." *Id.* Accordingly, relying on *Jackson v. McIntosh*, 90 F.3d

3    330, 332 (9th Cir. 1996), the Court held that the medical acceptability of the care

4    presented a triable question of fact.

5            Likewise, in this case, a question of fact exists as to the propriety of the medical

6    care provided to Plaintiff. The record reflects only the opinions of the UMC physicians,

7    who found that Plaintiff had a fracture in his lumbar spine that demanded his use of a

8    Jewett brace. It is also evident from the medical records that the recency of the back

9    injury was an open question; accordingly, interpreting the record in Plaintiff's favor, Dr.

10   Ozobia may well have prescribed the Jewett brace out of a concern that the injury

11   resulted from the September 2010 altercation. Regardless of the cause of the fracture, it

12   is a reasonable interpretation of the record to construe the six-week order as one to

13   ensure proper healing.

14           No other medical record before the Court contests Dr. Ozobia's recommended

15   course of treatment. That is, the submitted record lacks contrary medical conclusions by

16   Graham or others, from which a jury might conclude that Plaintiff did not have a

17   compression fracture or require the use of a Jewett brace. Similarly, the record is devoid

18   of affidavits or other evidence that support the notion that the alternative brace was

19   medically acceptable. Defendants seemingly imply that Graham found the alternative

20   brace to be medically acceptable (*see* dkt. no. 170-1 at 45), and within Defendants'

21   proffered record is Neven's grievance statement to Plaintiff that "Charge Nurse Beebe

22   clarified through the doctor that the back brace was issued for approximately one month

23   use for comfort and or support, not medically necessary for basic function" (dkt. no. 170-

24   1 at 55). Nevertheless, the medical acceptability remains disputed in light of the UMC

25   records, and even had Defendants provided evidence of medical acceptability, this Court

26   has held on a prior occasion that a difference in opinion among medical professionals,

27   as would be the case, may constitute an issue of fact for jury resolution. *White v. Snider*,

28   No. 3:08-cv-00252-RCJ-VPC, 2010 WL 331742, at *6 (D. Nev. Jan. 26, 2010).

1    In sum, the evidence raises a genuine issue regarding the medical acceptability of

2    the care provided to Plaintiff for his compression fracture. The record provides ample

3    basis to conclude that Defendants Graham and Neven knew of and disregarded this

4    serious medical need. The record further demonstrates Plaintiff's contemporary

5    complaints of pain and also deterioration of his back, which may or may not result from

6    the confiscation of the brace. Therefore, there is a sufficient basis for finding that Plaintiff

7    suffered harm. *Jett*, 439 F.3d at 1096. Accordingly, the Court denies summary judgment

8    on Count IV to Defendants Graham and Neven, but grants it as to the other Defendants.

9         **C.    Procedural Due Process Claim**

10             **1.    Standard**

11    The Fourteenth Amendment of the U.S. Constitution guarantees all citizens,

12    including inmates, due process of law. However, only certain interests receive the

13    guarantees of due process; an inmate's right to procedural due process arises only

14    when a constitutionally protected liberty or property interest is at stake. *Wilkinson v.*

15    *Austin*, 545 U.S. 209, 221 (2005). Therefore, courts analyze procedural due process

16    claims in two parts. First, the court must determine whether the plaintiff possessed a

17    constitutionally protected interest. *Brown v. Ore. Dep't of Corrs.*, 751 F.3d 983, 987 (9th

18    Cir. 2014). Second, and if so, the court must compare the required level of due process

19    with the procedures the defendants observed. *Id.*  A claim lies only where the plaintiff

20    has a protected interest, and defendants' procedure was constitutionally inadequate. *Id.*

21    Under the Due Process Clause, an inmate does not have liberty interests related

22    to prison officials' actions that fall within "the normal limits or range of custody which the

23    conviction has authorized the State to impose." *Sandin v. Conner*, 515 U.S. 472, 478

24    (1995) (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)). The Clause contains no

25    embedded right of an inmate to remain in a prison's general population. *Id.* at 485-86.

26    Further, "the transfer of an inmate to less amenable and more restrictive quarters for

27    nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a

28    prison sentence." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983), *overruled on other grounds*

*by Sandin*, 515 U.S. at 472-73. "Thus, the hardship associated with administrative segregation, such as loss of recreational and rehabilitative programs or confinement to one's cell for a lengthy period of time, does not violate the due process clause because there is no liberty interest in remaining in the general population." *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1315 (9th Cir. 1995).

State law also may create liberty interests protected under the Due Process Clause but "these interests will generally be limited to freedom from restraints which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84. As the Ninth Circuit Court of Appeals recently observed, "*Sandin* and its progeny made this much clear: to find a violation of a state-created liberty interest the hardship imposed on the prisoner must be 'atypical and significant . . . in relation to the ordinary incidents of prison life.'" *Chappell v. Mandeville,* 706 F.3d 1052, 1064 (9th Cir. 2013) (quoting *Sandin,* 515 U.S. at 483-84). Thus, under *Sandin*, Plaintiff may show a protected liberty interest not by reference to the language of NDOC procedural regulations, but instead by demonstrating that the administrative segregation to which he was subjected rises to the level of "atypical and significant hardship." *See id*.

When conducting the "atypical and significant hardship" inquiry, courts examine a "combination of conditions or factors . . . ." *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996). These conditions include: (1) the extent of difference between segregation and general population; (2) "the duration and intensity of the conditions confinement"; and (3) whether the sanction extends the length of the prisoner's sentence. *See Serrano*, 345 F.3d at 1078 (citing and discussing *Sandin*, 515 U.S. at 486-87); *Chappell,* 706 F.3d. 1064-65. Moreover, examination of this inquiry "requires case by case, fact by fact consideration." *Chappell,* 706 F.3d at 1064 (internal citation and quotation marks omitted).

On several occasions, courts have applied the *Sandin* factors to administrative segregation. "Typically," as the Ninth Circuit has observed, "administrative segregation in

1  and of itself does not implicate a protected liberty interest" under the *Sandin* factors.

2  *Serrano*, 345 F.3d at 1078. Only where the terms of segregation are extreme — for

3  example, indefinite solitary confinement that necessarily entails the loss of parole

4  eligibility — have most courts found that liberty interests might arise. *E.g.*, *Wilkinson*, 545

5  U.S. at 224; *Brown*, 751 F.3d at 988.

6      In terms of the second element, although "a prisoner is not wholly stripped of

7  constitutional protections when he is imprisoned for a crime . . . [,]" *Wolff v. McDonnell*,

8  418 U.S. 539, 555 (1974), his right to due process is not unfettered. In contrast to the

9  more expansive requirements applicable to prison disciplinary proceedings, *see Kirk v.*

10  *Foster*, No. 3:13-cv-00296-RCJ-WGC, 2014 WL 6792028, at *15 (D. Nev. Dec. 1, 2014)

11  (discussing *Wolff*, 418 U.S. at 564-71), the decision to hold an inmate in administrative

12  segregation imposes few procedural burdens on prison officials, *see Toussaint v.*

13  *McCarthy*, 801 F.2d 1080, 1101 (9th Cir. 1986).  Thus, while "administrative segregation

14  may not be used as a pretext for indefinite confinement of an inmate[,]" prison officials

15  provide adequate due process by holding an informal, non-adversarial evidentiary

16  hearing within a reasonable time after administrative segregation begins, with periodic

17  reviews thereafter to verify that continuing reasons support the segregation decision.

18  *See Hewitt*, 459 U.S. at 477 & n. 9. Continuing justification for the placement must be

19  supported by "some evidence," *Bruce v. Yist*, 351 F.3d 1283, 1287 (9th Cir. 2003), and is

20  a "minimally stringent" standard requiring only some basis for the decision, *see Castro v.*

21  *Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013).

22      The Ninth Circuit has declined to state its "view as to the frequency of periodic

23  review required." *Toussaint v. McCarthy*, 926 F.3d 800, 803 (9th Cir. 1990). It has found

24  review in 120 day intervals as sufficient (*id.*)*;* but it has rejected annual review as

25  consistent with due process requirements (*Toussaint*, 801 F.2d at 1101, *abrogated on*

26  *other grounds by Sandin*, 515 U.S. at 472). District Courts in the Ninth Circuit have

27  followed these guidelines, although at least one court has found a review every six

28  ///

1  months to satisfy due process guarantees. *See Corral v. Gonzalez*, No 1:12-cv-01315-
2  LJO-SKO, 2012 WL 3422491, at *3 (E.D. Cal. July 8, 2013).

3  ## 2.   Analysis of Count V

4  Plaintiff contends that Defendants Neven, Baca, Howell, Wickham, Morrow,
5  Gerke, Garcia, Daniels, and Oliver "directed or abetted" his placement in administrative
6  segregation for over twenty months, without due process, upon his return to HDSP from
7  the UMC Hospital. (Dkt. no. 27 at 13.) Defendants argue, first, that Plaintiff lacked a
8  liberty interest in remaining in general population; therefore, no process was due. (Dkt.
9  no. 143 at 19-20.) Plaintiff counters that administrative segregation deprives inmates of
10  certain privileges: the ability to receive packages, go to the law library, and eat in the
11  chow hall with other inmates. (Dkt. no. 170 at 21.) Plaintiff also contends that he was
12  held for 23 hours per day in solitary confinement. (*Id.* at 22.)

13  ### a.   First Element: Protected Liberty Interest

14  The Court concludes that there are triable issues of fact as to whether Plaintiff has
15  a stated-created liberty interest. Again, Plaintiff must show that this placement in
16  administrative segregation imposed "atypical and significant hardship" under *Sandin* to
17  show the existence of a protected liberty interest. *Serrano*, 345 F.3d at 1078. As
18  Defendants correctly observe, the SAC alleges no facts in support of atypical hardship,
19  but Plaintiff identifies relevant differences between administrative segregation and
20  general population (or protective custody) in his Opposition.[5] Although these are
21  uncorroborated statements, the Court considers them in absence of opposition by
22  Defendants and also this Court's obligation to "avoid applying summary judgment rules
23  strictly" against *pro se* prisoners. *Thomas v. Porter*, 11 F.3d 1144, 1150 (9th Cir. 2010).

24  First, Plaintiff points to four particular aspects of administrative segregation that
25  vary from general population conditions. Although the differences relating to packages,

26

27  ───────────────

28  [5]Plaintiff suggests that Defendants could have held him in protective custody, rather than in administrative segregation. To the extent he alleges that he was denied due process on that basis, an identical analysis applies.

1   visits to the library, and eating in the dining hall are relatively insignificant, the solitary

2   confinement condition is especially severe. The Ninth Circuit has recognized that solitary

3   confinement weighs in the inmate plaintiff's favor under in the *Sandin* analysis. *Brown*,

4   751 F.3d at 988 (finding "solitary confinement for over twenty-three hours each day with

5   almost no interpersonal contact" and denial of "most privileges afforded inmates in the

6   general population" as atypical hardship). Therefore, the Court finds that the first factor,

7   the extent of differences, supports an atypical hardship finding. *Serrano*, 345 F.3d at

8   1078.

9       Second, the record before the Court demonstrates that Plaintiff endured nearly

10  nineteen months in administrative segregation, from late September or early October

11  2010 until his transfer to LCC in late April 2012. (Dkt. no. 143-4 at 3-4.) Accordingly, the

12  duration of his placement also weighs in favor of an atypical hardship finding. *Serrano*,

13  345 F.3d at 1078; *Brown*, 751 F.3d at 988.

14      Finally, as to the third *Sandin* factor, Plaintiff does not claim his administrative

15  segregation placement lengthened his sentence, and the record lacks evidence so

16  suggesting. Nevertheless, the strength of the first two factors renders such a showing

17  unnecessary, for *Sandin* does not require a showing under each factor, *see Wilkinson*,

18  545 U.S. at 224, but involves a "case by case, fact by fact consideration," *Chappell,* 706

19  F.3d 1064. Considered together, the Court concludes that Plaintiff may be able to

20  establish that his administrative segregation placement presented atypical hardship,

21  and, therefore, that he had a liberty interest that demanded due process guarantees.

22              **b.    Second Element: Due Process**

23      The Court turns to Defendants' argument that they provided Plaintiff all process

24  that was constitutionally due. Under applicable precedent, Defendants could be

25  constitutionally obligated to hold nothing more than periodic reviews of Plaintiff's

26  placement to verify continuing reasons for such placement. *Hewitt*, 459 U.S. at 477 & n.

27  9; *Toussaint v. McCarthy*, 926 F.3d at 803. Here, Defendants point to evidence that

28  documents several classification hearings and reviews of Plaintiff's placement between

24

1    his return to HDSP in September 2010 and his transfer to LCC in April 2012. (Dkt. no.

2    143 at 20-21.) These reviews occurred on the following dates: September 30, 2010;

3    October 13, 2010; October 20, 2010; November 5, 2010; June 3, 2011; July 11, 2011;

4    August 16, 2011; September 13, 2011; and April 20, 2012. (Dkt. nos. 143-1 at 5, 143-4

5    at 3-4.) Accordingly, they move for summary judgment on the basis that "approximately

6    every two months his housing was evaluated . . . ." (Dkt. no. 143 at 21.) Plaintiff disputes

7    that he received such hearings or reviews, but he supports this position with only bare

8    allegations. (*See* dkt. nos. 27 at 14, 22.)

9          Defendants' own proffered evidence does not support their contention that they

10   provided review every two months.[6] In fact, it reveals unexplained gaps of seven

11   months: the first between November 2010 and June 2011, and the second between

12   September 2011 and April 2012. These were measurably longer periods than the 120

13   days deemed reasonable by the Ninth Circuit. *Toussaint*, 926 F.3d at 803. Because this

14   Court draws all inferences in Plaintiff's favor at the summary judgment stage,

15   Defendants have not established that they provided Plaintiff with adequate due process.

16   Therefore, they are not entitled to summary judgment.[7]

17         **D.    Loss of Property Claim**

18              **1.    Standard**

19         Prisoners have a constitutionally protected interest in their personal property;

20   therefore, the Fourteenth Amendment guarantees due process to deprivations of inmate

21   property. *Hansen v. May*, 502 F.2d 728, 730 (9th Cir. 1974). Because the constitutional

22   violation is the state's failure to provide due process, rather than the taking or loss itself,

23   "it is necessary to ask what process the State provided, and whether it was

24   constitutionally adequate. This inquiry . . . examine[s] the procedural safeguards built

25   _____

26        [6]The record indicates that "some evidence," namely, the continued presence of
     Sureños at HDSP, justified Plaintiff's placement in segregation when his periodic reviews
27   occurred. (*See* dkt. nos. 143-1 at 5-6, 143-4 at 3-4).

28        [7]The Court considers the qualified immunity defense for the relevant Defendants
     in Part III.E, *infra*.

1   into the statutory or administrative procedure effecting the deprivation, and any remedies

2   for erroneous deprivations provided by statute or tort law." *Zinermon v. Burch*, 494 U.S.

3   113, 125-26 (1990).

4          When determining whether post-deprivation remedies preclude liability under the

5   Fourteenth Amendment, courts distinguish between unauthorized deprivations and

6   authorized, intentional deprivations. Neither negligent nor intentional unauthorized

7   deprivations of property by prison officials are actionable under § 1983 when the state

8   provides a post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Quick*

9   *v. Jones*, 754 F.2d 1521, 1524 (9th Cir. 1985). In contrast, an authorized, intentional

10  deprivation of property is actionable under the Due Process Clause, irrespective of post-

11  deprivation remedies. "Authorized" deprivations are those carried out pursuant to a

12  state's established procedures, regulations, or statutes, *see Logan v. Zimmerman Brush*

13  *Co.*, 455 U.S. 422, 435-36 (1982), and also those conducted under the apparent

14  authority of state procedures, regulations, or statutes, *see Piatt v. MacDougall*, 773 F.2d

15  1032, 1036 (9th Cir. 1985).

16                      **2.    Analysis of Count VI**

17         Plaintiff seeks relief for the deprivation of "miscellaneous items" and certain legal

18  papers, which he alleges that Defendants Vasquez, Lindsay, Fowler, and Melton

19  misplaced when removing him from his cell following the July 2010 altercation with his

20  cellmate. (Dkt. no. 27 at 14.) Defendants argue that Plaintiff does not state a

21  constitutional claim because the State of Nevada makes available post-deprivation civil

22  remedies for unauthorized deprivations such as these. (Dkt. no. 143 at 22.)

23         Plaintiff characterizes the deprivation of his legal papers and other items as

24  unintentional takings. In the SAC, for example, he describes a claim for "loss" of

25  property, rather than an intentional taking authorized by state law. No alleged facts state

26  that Defendants responsible for his missing belongings misplaced or permanently

27  misplaced them pursuant to authorized policies. (*See* Dkt. no. 27 at 14.) Similarly,

28  Plaintiff's Opposition designates no facts that remotely suggest that the takings were

1   authorized by law. Because Plaintiff's claim is for an unauthorized (and apparently

2   negligent) deprivation, and as Nevada permits inmates to bring civil actions against

3   NDOC officials for the loss of property, *see* NRS 41.0322, Plaintiff's recourse lies solely

4   in a state law claim. *See Hudson*, 468 U.S. at 533; *Quick*, 754 F.2d at 1524. Accordingly,

5   Defendants are entitled to summary judgment on Count VI.

6          **E.     Qualified Immunity**

7          Throughout their Motion, Defendants argue that they are entitled to summary

8   judgment on the basis of qualified immunity. For ease of analysis, the Court analyzed the

9   claims on their merits and found in all instances, aside from Count IV's claims against

10  Graham and Neven and Count V's claims against Defendants Neven, Baca, Howell,

11  Wickham, Morrow, Gerke, Garcia, Daniels, and Oliver, that the claims fail on their merits.

12  Notwithstanding its identification of genuine factual disputes, the Court considers

13  qualified immunity as to the remaining Defendants with respect to Count IV and V.

14         The Eleventh Amendment bars damages claims and other actions for retroactive

15  relief against state officials sued in their official capacities, *Brown*, 751 F.3d at 988-89

16  (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)), and they

17  may also affirmatively defend § 1983 claims brought against them in their individual

18  capacities on the ground of qualified immunity. *Spoklie v. Montana*, 411 F.3d 1051, 1060

19  (9th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). District courts are to

20  decide whether defendants are entitled to qualified immunity as a matter of law, unless

21  material facts regarding the defense are genuinely disputed. *Conner v. Heiman*, 672

22  F.3d 1126, 1131 (9th Cir. 2012).

23         When conducting the qualified immunity analysis, district courts "ask (1) whether

24  the official violated a constitutional right and (2) whether the constitutional right was

25  clearly established." *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014) (citing

26  *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). The court may analyze the

27  elements of the test in whatever order is appropriate under the circumstances of the

28  case. *Pearson*, 555 U.S. at 240-42. Whether the right is established is an objective

1    inquiry, and it turns on whether a reasonable official in the defendant's position should

2    have known at the time that his conduct was constitutionally infirm. *Anderson v.*

3    *Creighton,* 483 U.S. 635, 639-40, (1987); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915

4    (9th Cir. 2012). Stated differently, only where a state official's belief as to the

5    constitutionality of his conduct is "plainly incompetent" is qualified immunity unavailable.

6    *Stanton v. Sims*, 571 U.S. —, 134 S.Ct. 3, 5 (2013) (per curiam).

7          Although the second inquiry is highly deferential, it is not necessary that the

8    precise action has previously been held unlawful for a right to be "clearly established."

9    *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). Indeed, to define the right too

10    narrowly is, as the Ninth Circuit has explained, to allow defendants "to define away all

11    potential claims." *Kelley v. Borg,* 60 F.3d 664, 667 (9th Cir. 1995). Therefore, the Court

12    must assess qualified immunity "'in light of the specific context of the case.'" *Tarabochia*

13    *v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Robinson v. York*, 566 F.3d 817,

14    821 (9th Cir. 2009)).

15              **1.**    **Count IV**

16          Defendant Neven is entitled to qualified immunity on the Count IV medical care

17    claim. As reasoned above, Plaintiff's Eighth Amendment rights may have been violated;

18    therefore, the Court turns to the second element of the inquiry. It was clearly-established

19    law as of September 2010 that deliberate indifference to serious medical needs of

20    prisoners violates the Eighth Amendment, *Estelle,* 429 U.S. at 104, and that, at

21    minimum, prison officials must provide medically acceptable care, *Colwell*, 763 F.3d at

22    1068. However, under the circumstances, Neven was not "plainly incompetent," *Stanton*,

23    134 S.Ct. at 5, in believing that the level of care that HDSP medical staff provided to

24    Plaintiff was medically acceptable. Neven is the HDSP Warden, rather than a physician

25    or other medical staff. As such, he reasonably relies on the measured judgments of his

26    staff clinicians about the care an inmate requires. The record suggests that Graham

27    made the decision that providing Plaintiff the alternative brace was medically acceptable.

28    Neven was not incompetent by believing he satisfied Eighth Amendment obligations by

1   relying on Graham's apparent judgment. *See, e.g.*, *Davis v. Davis*, No 2:11-cv-3241

2   WBS CKD, 2014 WL 4187360, at *3 (E.D. Cal. Aug 21, 2014); *Lopez v. McGrath*, No. C

3   04-4782 MHP, 2007 WL 1577893, at *10 (N.D. Cal. May 31, 2007). If Plaintiff had

4   produced facts that suggested Neven somehow superseded Graham's contrary

5   decision, the result may well be different as to Neven. In absence of such allegations

6   and facts, however, Neven is entitled to qualified immunity.

7        In contrast, Defendant Graham is not entitled to qualified immunity. One of the

8   central factual issues in the Count IV Eighth Amendment claim is whether the alternative

9   brace was medically acceptable care for Plaintiff's compression fracture. As the

10   physician who apparently ordered the alternative brace (dkt. no. 170-1 at 45), Graham

11   seemingly relied on no others to determine that this was medically acceptable care.

12   Indeed, as a licensed medical provider, it is his fundamental obligation to know whether

13   a prescribed course of care is medically acceptable. Therefore, qualified immunity as to

14   Graham turns on the disputed issue of whether the care was, in fact, medically

15   acceptable. If it was not, he would have been plainly incompetent in so believing, for no

16   reasonable prison physician could believe, as of September 2010, that providing

17   medically unacceptable care to an inmate would satisfy his constitutional obligations.

18             **2.**    **Count V**

19        All Defendants are entitled to qualified immunity on the procedural due process

20   claim asserted in Count V. Notwithstanding the remaining factual issues, it was not

21   clearly established law in the Ninth Circuit that review of administrative segregation

22   placement in seven month intervals — or, more accurately, monthly reviews with two

23   seven-month gaps — violated Plaintiff's Fourteenth Amendment rights. On opposite

24   poles are two Ninth Circuit cases that discuss the reasonableness of review intervals:

25   120 days is permissible, but 360 days is not. This Court has not located other authority in

26   this District or the Ninth Circuit identifying intervening benchmarks by which Defendants

27   could have determined the lawfulness of their conduct *ex ante*. Accordingly, in absence

28   of clearly established law, *City of Sonora*, 769 F.3d at 1022, Defendants were not

1  "plainly incompetent" in believing that the review they provided was constitutionally

2  sufficient. However careless their adherence to Plaintiff's rights and applicable prison

3  protocol might have been, they are entitled to qualified immunity on Count V.

4  **V.    CONCLUSION**

5      The Court notes that the parties made several arguments and cited to several

6  cases not discussed above. The Court has reviewed these arguments and cases and

7  determines that they do not warrant discussion as they do not affect the outcome of the

8  Motion.

9      It is therefore ordered that Defendants' Motion for Summary Judgment (dkt. no.

10  143) is granted on all claims, except for the Count IV claim against Graham. All other

11  claims against Defendants are dismissed.

12      DATED THIS 24th day of March 2015.

13

14  _____
    MIRANDA M. DU
15      UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28